UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JIMMIE LEE HARRISON,

        Plaintiff,

v.

UNKNOWN CLARK and
CORIZON, INC.,

        Defendants.
_____/

Case No. 1:20-cv-271

Hon. Paul L. Maloney

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). Plaintiff filed this action against defendants Corizon, Inc. ("Corizon") and Melanie Clark, M.D. (sometimes referred to as "Dr. Clark" or the "doctor"). This matter is now before the Court on defendants' motion for summary judgment (ECF No. 49). The motion is unopposed.

    **I.**    **Plaintiff's claims**

The gist of plaintiff's claim is that defendants Corizon and Dr. Clark, a mental health provider at the Lakeland Correctional Facility (LCF), failed to taper his Effexor dosage from 375 mg per day to 250 mg per day, which resulted plaintiff suffering from symptoms due to a "cold turkey" withdrawal from this medication. Plaintiff's complaint is not chronological, does not include numbered paragraphs, is difficult to follow, and includes about 200 pages of exhibits. In order to address plaintiff's claims and defendants' motion in an organized manner, the Court will summarize plaintiff's allegations, and provide a chronology based on the complaint, the medical records, and Dr. Clark's Declaration.

1

### A.     Plaintiff's complaint

Plaintiff filed this action on March 27, 2020, and made the following allegations in his complaint. Plaintiff suffers from chronic depression. Compl. (ECF No. 1, PageID.3). Dr. Clark knew that plaintiff was prescribed 375 mg of Effexor while he was at a different correctional facility. *Id*. When plaintiff transferred to LCF, Dr. Clark reduced his Effexor prescription by 150mg, from 375 mg per day to 250 mg per day. *Id*. Plaintiff went through withdrawal, which included throwing up and bad headaches. *Id*. Dr. Clark also discontinued prescriptions for Cogentin and Benztropine. *Id*. Plaintiff contends that defendants took him off medications "cold turkey" in October 2019, and that on or about October 15, 2019, he fainted in the prison yard, where he required medication for severe headache, nausea, and vomiting. *Id*. at PageID.6-7.

Plaintiff performed research on Effexor in the *Physicians Desk Reference* (*PDR*), where he discovered that Effexor dosage should be "tapered gradually and the patient monitored." *Id*. at PageID.8. According to the *PDR*, "Patients who have received Effexor for 7 weeks or more should have their dose tapered gradually over a 2 week period" and that the "discontinuation effects" include headaches, insomnia, nausea, and nervousness. *Id*. at PageID.9-10. Plaintiff was prescribed Lexapro, which in his words "was like not prescribing nothing." *Id*. at PageID.10. Plaintiff filed a number of health care requests throughout November and December 2019, and January 2020. *Id*.

Ultimately, "[i]t was decided by Defendant Clark that she was not going to give plaintiff any medication for his Major Depressive Disorder." *Id*. (emphasis omitted). Plaintiff contends that "[t]his was not a disagreement about the course of treatment that she chose for plaintiff." *Id*. Rather, plaintiff contends that this was deliberate indifference to a serious mental health illness which caused him unnecessary pain and suffering "by making plaintiff go 'Cold

Turkey'" and providing no treatment at all for his major depressive disorder because the new medication (Lexapro) did nothing and made his depression and anxiety worse. *Id.* at PageID.10-11. Plaintiff contends that defendants violated his rights under the 8th Amendment and asks for compensatory and punitive damages in the amount of $260,000.00. *Id*. at PageID.22, 25.

### B.    Dr. Clark's Declaration

In her declaration (ECF No. 49-1), Dr. Clark set forth a chronology of her interactions with plaintiff, commencing with plaintiff's initial visit on or about July 29, 2019.[1]

> 8.    Prior to my involvement in Mr. Harrison's medical care, he had an active prescription for Effexor 150 mg every night and 225 mg at noon. However, on July 29, 2019, Mr. Harrison's nightly dose of Effexor was discontinued to be in line with the FDA dosing recommendations and MDOC formulary guidelines.
>
> 9.    On October 7, 2019, Mr. Harrison presented for a telepsych medication review. I noted Mr. Harrison complained at length about having too much of his Effexor stopped and noted he was experiencing withdrawal symptoms and had concerns about becoming depressed, isolated, and withdrawn. I noted any withdrawal was resolving and Mr. Harrison had not relapsed into depression. I renewed Mr. Harrison's medications during this visit.
>
> 10.    On October 10, 2019, I performed a chart update noting Mr. Harrison was a no show for his visit and he had been detected three times with his medications tucked into his lip or cheek. I noted that one of the diverted medications was Effexor, for which I have a zero-tolerance action for diverters on my service. I noted the medications abused would be stopped and Mr. Harrison would be rescheduled to discuss the need for alternatives.
>
> 11. On October 11, 2019, Mr. Harrison presented for a telepsych visit to discuss the discontinuation of his medication after multiple attempts to cheek his Effexor and to discuss potential alternatives. Mr. Harrison presented several explanations for the repeated observation of pills in his mouth and concluded that he had already been tapered faster than he wanted to get down to the recommended cutoff dose. I scheduled another appointment for six weeks to discuss another antidepressant if needed.
>
> 12.    On October 21, 2019, Mr. Harrison presented for a telepsych visit to discuss his complaints attributed to medication withdrawal and lack of side effect medications. I noted this was despite Mr. Harrison taking no medications that

---

[1] The Court notes that Dr. Clark's chronology is consistent with plaintiff's medical records (ECF No. 41, PageID.512-513, 520-521, 523-525, 536-538, 551-552).

> would cause side effects. I noted Mr. Harrison reported nausea, vomiting, headaches, and insomnia and reported no change or improvement over the past 11 days off his medications. Mr. Harrison noted he expected this to last weeks or months longer unless he gets the medications that helped it (Zofran and Toradol). I noted that since Zofran and Toradol were not psychiatric medications, I would need to refer him back to healthcare. Mr. Harrison stated that since the nurse didn't give him any tickets, no violation occurred, and he should incur no consequences. Mr. Harrison was advised he will not be placed back on Effexor or Wellbutrin, even after refusing adequate trials of all other medications. I noted I offered trials of previously untried antidepressants. I scheduled Mr. Harrison for a medication review follow up for six weeks and ordered Lexapro 10 mg for depression.
>
> 13. On December 5, 2019, Mr. Harrison presented for a telepsych visit regarding medication follow up. I noted Mr. Harrison presented as angry, rebarbative, hostile, resentful, and threatening litigation. Mr. Harrison claimed that he was going through withdrawal, which had been getting worse for three weeks post stopping his Effexor. I noted this was inconsistent with the course of withdrawal and it appeared Mr. Harrison read some of the symptoms of withdrawal but was unaware of onset or progression. Mr. Harrison believed there were formulary meds that worked as he specified, but that he had not been given yet. I noted that there were none; he had trials of all formulary meds. I advised Mr. Harrison that I saw little possible benefit in continuing antidepressant trials and the Lexapro order would be stopped. I advised Mr. Harrison to follow up in three months if he was interested in retrying medications according to guidelines and encouraged him to pursue non-pharmaceutical therapy. I did not tell Mr. Harrison I would call him out in two days.

Dr. Clark Decl. at PageID.645-647.[2]

## II.    Defendants' motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

---

[2] Dr. Clark's declaration also addresses visits with plaintiff after he filed the lawsuit. *See* Dr. Clark Decl. at ¶¶ 14-15, PageID.648 (telepsych visit on April 16, 2020, and medication review on July 2, 2020).  These visits are not part of plaintiff's complaint.

4

> stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Plaintiff did not file a response to the motion for summary judgment. The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). The trial court is required to "intelligently and carefully review the legitimacy of such unresponded-to motion" and cannot "blithely accept the conclusions argued in the motion." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 407 (6th Cir. 1992). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Id.* at 405.

In an apparent attempt to file a verified complaint and pre-empt a motion for summary judgment,[3] plaintiff added a self-styled attestation clause as follows:

> The plaintiff swears that all here in this complaint is true and correct and to the best of his knowledge, and under the penalty of perjury.

Compl. at PageID.25.  Plaintiff's attempt to verify his complaint fails.  First, plaintiff's statement is not an affidavit. There is no notary jurat.  *See* M.C.L. § 55.265(a) (" 'Jurat' means a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record."). "The absence of a jurat or other evidence of verification requires a finding that the document fails to constitute an affidavit." *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished), citing *Merrifield v. Village of Paw Paw*, 274 Mich. 550; 265 N.W. 461 (1936).  "A purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all." *Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930).

Second, this is not an unsworn declaration under 28 U.S.C. § 1746, which must be substantially in this form:

> I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

28 U.S.C. § 1746(1).  Plaintiff has diluted the statute's explicit requirements by making the statement conditional on "the best of his knowledge."

---

[3] *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment).

Finally, plaintiff cannot create a genuine issue of material fact based on "knowledge and belief". Fed. R. Civ. P. 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." A party's statement made "to the best of my knowledge, information and belief" does not demonstrate personal knowledge and cannot create genuine issues of fact for purposes of a summary judgment motion. *Kiplinger v. Selene Finance, LP*, No. 1:15-cv-105, 2015 WL 9255564 at *3 (W.D. Mich. Dec. 18, 2015). *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (a court may not consider statements made on "belief" or "information and belief" in deciding a summary judgment motion); *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 139 (2d. Cir. 2009) ("the common expression 'to the best of my knowledge' . . . seems to inject a level of uncertainty into just how sure the declarer is of the truth of the asserted fact"); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that the affiant's "statement . . . based upon his 'belief'. . . did not demonstrate the personal knowledge required by Fed. R. Civ. P. 56(e)"). Here, many of the statements in plaintiff's complaint consist of a rambling narrative, hearsay evidence and self-styled expert opinions drawn from his review of the *PDR*. Such statements are not in a form which the Court would equate with competent trial testimony.

    **B.**  **Lack of Exhaustion as to defendant Corizon**

    1.  **Exhaustion requirement**

Defendant Corizon contends that plaintiff failed to exhaust his claims against it. The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available

7

administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective March 18, 2019). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ Q. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ Q and S. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ S (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ W. If the prisoner is dissatisfied with the Step I response, or does

8

not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.  *Id.* at ¶ DD.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section.  *Id.* at ¶ HH.

### 3. Discussion

Defendant Corizon identified one grievance related to plaintiff's claim, LCF-19-10-0959-28E ("959").[4]  In this grievance, dated October 13, 2019, plaintiff complained that he "recently found out" that on August 1, 2019, "Corizon is the guilty party for decreasing my Effexor from 375 mg to 225 mg without 'winging me Down'."  Grievance 959 (ECF No. 40-3, PageID.455).  The grievance was denied as untimely.  *Id*.  Plaintiff's Step II appeal was rejected as "untimely submitted @ Step II."  *Id*. at PageID.454, 456.  The rejection was upheld at Step III.  *Id*. at PageID.453.  Plaintiff has failed to properly exhaust his claims against defendant Corizon.  *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93.  Accordingly, Corizon's motion for summary judgment should be granted on this basis.

### C. 8th Amendment claim

### 1. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and

---

[4] The Court notes that Corizon erroneously identified this grievance as KCF-19-10-0959-28E.  *See* Defendants' Brief (ECF No. 49, PageID.641).

(2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, plaintiff has alleged that defendants violated his rights under the 8th Amendment by being deliberately indifferent to his serious medical needs. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the 8th Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable 8th Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id*. at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an 8th Amendment violation. *Id*. at 835. "It is obduracy and

10

wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734, F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

**2. Discussion**

Assuming that plaintiff has a severe medical condition, plaintiff has failed to establish the objective or subjective component of his 8th Amendment claim. As an initial matter, Dr. Clark stated that in her medical judgment, plaintiff did not need Effexor to treat his medical condition because he did not take the medication as prescribed:

> 3. I have a zero tolerance policy when it comes to diverting and cheeking medication. If an inmate is caught cheeking, snorting, or selling to another inmate for purposes of snorting medication then the inmate is not taking their medication and are not benefiting from prescribed medication. While some providers will order a crush and/or dissolve order, I do not as in my experience when a medication is crushed an inmate can still divert the medication and most inmates will not take a medication that has been dissolved in water as they do not like the taste. I treat all inmates as adults who make their own choices when deciding to cheek and/or divert their medication. I discontinue the medication when I learn the medication is not being taken as prescribed. In my medical judgment, there was no medical indication for the prescription if it is not being taken as prescribed.

Dr. Clark Decl. at PageID.644-645.

Dr. Clark acknowledged that adverse side effects can occur if a patient taking Effexor continuously stops taking that medication. In this regard, the doctor noted that the medication could potentially be habit forming if the patient abused it:

> 4. Venlafaxine (Effexor) is not associated with addiction or habituation as it is not a mood-altering drug (i.e. opioid, benzodiazepine, or amphetamine).
>
> 5. The only way Effexor could *potentially* be habit forming is if the medication is crushed and snorted, creating a stimulating effect in the brain.

> 6. While Effexor is not a habit-forming drug, adverse side effects could happen if a patient taking Effexor continuously stops taking the medication.

*Id*. at PageID.645 (emphasis in original).

Here, Dr. Clark noted that plaintiff's symptoms would be minimized because he had a history of failing to take his medication as directed.

> 7. Mr. Harrison was caught cheeking his medications on multiple occasions which shows that Mr. Harrison was not taking his medication as scheduled. Thus any withdrawal symptoms he would have had would have only lasted for days, not weeks, and been grossly minimized due to his inconsistency in taking his medications as prescribed.

*Id*. In this regard, during the telepsych examination on October 21, 2021, Dr. Clark addressed plaintiff's actions of cheeking some medication and refusing other medication:

> Pt is aggrieved because, after being caught cheeking effexor and cogentin three times (and refusing the geodon the cogentin was claimed to be needed for), both meds were d/c'd. He feels that, since the nurse didn't give tickets, no violation occurred and he should incur no consequences. Pt demonstrated capacity for creating his own med rules and cursing explosively when challenged on them.

Medical Records at PageID.536. At that time, plaintiff was advised that "he will not be placed back on Effexor, nor on Wellbutrin, even after refusing adequate trials of all other meds," with the doctor noting that "[h]e was offered trials of previously untried antidepressants." *Id*.

Contrary to plaintiff's allegations, there is no evidence that Dr. Clark engaged in deliberate indifference to a serious medical need by stopping his Effexor prescription "cold turkey", prescribing him medication which made him worse, and allowing him to suffer without any treatment. *See* Compl. at PageID.5-15. The record reflects: that Dr. Clark eliminated the 150mg nighttime dosage of Effexor to be in line with the FDA dosing recommendations and MDOC formulary guidelines; that the doctor acted on reports that plaintiff was abusing his medication by "cheeking"; that the doctor monitored plaintiff's condition, including any reported adverse effects from lowering the Effexor dosage; that in the doctor's medical judgment, plaintiff's

12

complaints of withdrawal were not related to the discontinuation of Effexor; that the doctor attempted to use other medications; that the doctor prescribed trials of other formulary medications; that plaintiff incorrectly believed there were formulary medications the doctor could prescribe; that based on the treatment history the doctor advised plaintiff that there was little possible benefit to continuing antidepressant drug trials; that the doctor advised plaintiff to pursue non-pharmaceutical therapy; and that plaintiff could follow up in three months if he was interested in in retrying medications according to guidelines.

"[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Based on this record, Dr. Clerk did not exhibit obduracy or wantonness in treating plaintiff, nor exhibit a mental state equivalent to criminal recklessness. *See Whitley*, 475 U.S. at 319; *Santiago*, 734 F.3d at 591. Accordingly, defendants' motion for summary judgment should be granted as to plaintiff's 8th Amendment claims.

### III.     Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 49) be **GRANTED** and that this action be **TERMINATED**.

Dated: August 23, 2021                         /s/ Ray Kent
                                                United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).